UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| BAYOU CITY WATERKEEPER, | § | CIVIL ACTION NO. 3:20-CV-255 |
| Plaintiff, | § | |
| | § | |
| V. | § | |
| | § | |
| U.S. ARMY CORPS OF ENGINEERS; | § | |
| COLONEL TIMOTHY R. VAIL, IN HIS | § | |
| OFFICIAL CAPACITY AS DISTRICT | § | |
| ENGINEER, GALVESTON DISTRICT - | § | |
| U.S. ARMY CORPS OF ENGINEERS; | § | |
| LIEUTENANT GENERAL TODD T. | § | |
| SEMONITE, IN HIS OFFICIAL | § | |
| CAPACITY AS CHIEF AND | § | |
| COMMANDER OF ENGINEERS, U.S. | § | |
| ARMY CORPS OF ENGINEERS; AND | § | |
| RYAN MCCARTHY, IN HIS OFFICIAL | § | |
| CAPACITY AS SECRETARY OF THE | § | |
| ARMY, | § | |
| | § | |
| Defendants. | | |

Plaintiff Bayou City Waterkeeper's Original Complaint

I. Introduction

1.      Bayou City Waterkeeper brings this lawsuit against the U.S. Army Corps of Engineers ("Corps") under Section 706(2) of the Administrative Procedure Act. 5 U.S.C. § 706(2). Bayou City Waterkeeper asserts that in issuing an approved jurisdictional determination ("AJD") to Broad Reach Partners LP ("Broad Reach") for a residential real estate development in League City, Texas, the Corps acted in an arbitrary and capricious

1

manner, abused its discretion, and otherwise acted in a manner that was not in accordance with the Clean Water Act and related regulations and policies. *See* 33 U.S.C. § 1251, et seq. Bayou City Waterkeeper asks this Court to vacate the AJD.

2.    In 2012, Broad Reach applied for a permit from the Corps under Section 404 of the Clean Water Act. *See* 33 U.S.C. § 1344. Broad Reach asked the Corps for permission to fill about an acre of wetlands on a 30-acre tract, sited largely within the 100-year floodplain along Robinson Bayou in League City—but ignored nearly 9 acres of forested wetlands affected by its project. During the comment period, the U.S. Environmental Protection Agency ("EPA") and other federal and state agencies raised concerns about the project's failure to adequately account for the wetlands on the property. In March 2014, the Corps withdrew the permit application due to Broad Reach's failure to resolve these concerns. The property remained undeveloped, and the wetlands were still intact.

3.    In 2015, without revisiting the permitting process under the Clean Water Act, Broad Reach began to clear the property of trees and fill in all wetlands but those closest to the bayou. Work continued off and on over the next several years. In 2018, a concerned resident filed a complaint with the Corps. In April 2019, the Corps issued an AJD that retroactively deemed only 1.35 acres of wetlands—precisely those that had not been filled—as jurisdictional. The Corps relied extensively on evidence provided by the developer's paid consultants, did not confer with EPA about its decision to exclude

nearly 9 acres of forested wetlands from jurisdiction, and did not require Broad Reach to obtain a Section 404 permit.

4.       The decision to issue an AJD was arbitrary and capricious, an abuse of discretion, and not in accordance with the Clean Water Act and relevant regulations and internal guidance that require the Corps to regulate wetlands within its jurisdiction. By issuing an after-the-fact AJD that omitted most of the property's wetlands, the Corps violated Section 706(2)(A) of the Administrative Procedure Act because:

a.  When the wetlands had not yet been filled, the Corps previously withdrew Broad Reach's permit application, citing Broad Reach's failure to resolve EPA's concerns regarding the wetland delineation—yet after the wetlands had been filled, the Corps sanctioned Broad Reach's actions without addressing the EPA's concerns;

b.  The Corps issued the AJD in April 2019 only after Broad Reach had filled and regraded most of the site—destroying the best evidence of wetlands on the site (the wetlands themselves)— and despite Broad Reach's actions, the Corps deferred to wetland data prepared by Broad Reach's consultants instead of conducting an independent analysis;

c.  In issuing the AJD, the Corps did not address concerns raised by federal and state agencies during the permit application process, and did not consult with the EPA, except with respect to one "isolated" wetland;

d.  In issuing the AJD, the Corps omitted headwater wetland areas it previously had deemed jurisdictional;

e.  In issuing the AJD, the Corps ignored wetlands within the 100-year floodplain and connected by a stream to jurisdictional wetlands and ignored other aspects of those wetlands that supported their jurisdictionality; and

f.  The Corps issued the AJD seemingly in response to concerns raised by area residents and allowed Broad Reach to avoid public scrutiny and circumvent the federal permitting process that it previously was unable to comply with.

5.      Bayou City Waterkeeper asks this Court to vacate the AJD and enter other declaratory and injunctive relief.

## II. Jurisdiction & Venue

6.      This Court has subject matter jurisdiction over this action under 28 U.S.C § 1331 (federal question) and 28 U.S.C. § 1346 (United States as Defendant). This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 702, 706(2), and the Clean Water Act. 33 U.S.C. § 1251, et seq.

7.     The relief requested is authorized by 5 U.S.C. § 706 (court may "hold unlawful and set aside agency action, findings, and conclusions found to be… arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"), and 28 U.S.C. §§ 2201 and 2202 (further necessary or proper relief based on a declaratory judgment).

8.     Venue is proper under 28 U.S.C. § 1391(b)(1)-(2) and (e). A substantial part of the events giving rise to these claims occurred within Galveston County, which is within the Galveston Division of the U.S. District Court for the Southern District of Texas.

### III. Statute of Limitations

9.     A six-year statute of limitations applies. 28 U.S.C. § 2401. Bayou City Waterkeeper's claim falls within that time period because the Corps issued the AJD that is the subject of this lawsuit in April 2019.

### IV. Parties

10.     The plaintiff Bayou City Waterkeeper is a 501(c)(3) non-profit organization incorporated in the State of Texas. Bayou City Waterkeeper is located at 2010 North Loop West, Suite 103, Houston, Texas 77018.

11.     The defendant United States Army Corps of Engineers is sued as an agency of the United States Government. The Corps may be served by serving Lieutenant General Todd T. Semonite at 441 G Street NW Washington, DC 20314-1000.

12.     Col. Timothy R. Vail is sued in his official capacity as District Engineer of the Galveston District of the U.S. Army Corps of Engineers. He may be served at P.O. Box 1229, Galveston, Texas 77553-1229.

13.     Lieutenant General Todd T. Semonite is sued in his official capacity as Chief and Commander of the U.S. Army Corps of Engineers. He may be served at 441 G Street NW Washington, DC 20314-1000.

14.     Ryan McCarthy is sued in his official capacity as Secretary of the Army. He may be served at 101 Army Pentagon Washington, DC 20310-0101.

15.     In the complaint the defendants are collectively referred to as "the Corps."

V. Standing

16.     Bayou City Waterkeeper was founded in 2001 as Galveston Baykeeper. Its headquarters are in Houston, Texas.

17.     Throughout its history, Bayou City Waterkeeper has worked to preserve and protect wetlands within the Lower Galveston Bay watershed, as well as the benefits they provide communities and wildlife across the region. These benefits include: protection from floods, habitat for local species, filtering surface water that makes its way into the city's water supplies, and providing a place for people to enjoy nature and wildlife in an increasingly urban environment.

18.     Since its inception, Bayou City Waterkeeper has opposed unlawful developments over wetlands, advocated for mitigation of wetland losses, and supported rules and

lawsuits to protect our region's wetlands. Further, Bayou City Waterkeeper's commitment to the long-term resilience of communities across the Lower Galveston Bay watershed motivates the organization to protect local communities from flooding by promoting nature-based flood protections, including wetlands.

19.     To protect wetlands, Bayou City Waterkeeper relies on the federal regulatory program established under Section 404 of the Clean Water Act.

20.     Bayou City Waterkeeper's members include individuals who are residents of the Bayou Brae neighborhood next to Broad Reach's development.

21.     Bayou City Waterkeeper's members have visited Robinson Bayou, as well as waters downstream of the bayou like Clear Creek, Clear Lake, and Galveston Bay, to kayak, bird watch, observe other wildlife, enjoy and photograph nature and scenic beauty, experience solitude and quiet, enjoy natural sounds, and recreate.

22.     As elaborated below, because of the Corps' actions, Broad Reach's development will proceed without any form of mitigation that otherwise would be required under Section 404 of the Clean Water Act. As a result, Bayou City Waterkeeper's members fear that they will face an increased risk of flooding. This fear is well-founded: Although the Bayou Brae neighborhood has not flooded, Bayou City Waterkeeper's members who are residents of the Bayou Brae neighborhood have reported that after clearing began, some yards located closest to Robinson Bayou flooded for the first time. These residents fear

that the threat of increased flooding and the loss of the forest's aesthetic value will cause more flooding and also affect their property values in this desirable neighborhood.

23.     Also as a result of the Corps' actions, Robinson Bayou will be forced to bear increased sedimentation and runoff, which will affect Bayou City Waterkeeper's members ability to kayak and otherwise enjoy all the benefits offered by Robinson Bayou that they currently enjoy. Already, Bayou City Waterkeeper's members have reported a decrease in birds and other wildlife as a result of Broad Reach's ongoing development.

24.     This litigation will redress the injuries felt by Bayou City Waterkeeper's members. Once the Corps' unlawful AJD is vacated, the Clean Water Act's protections will apply to the wetlands that have been filled and trigger mitigation requirements, which will redress Bayou City Waterkeeper's members' fears about flooding, concerns about property values, and injuries to their aesthetic and recreational interests.

## VI. Factual Allegations

25.     The property at the center of this lawsuit is in League City, which is in Galveston County, Texas (29.528467, -95.078393). The property is directly east of Robinson Bayou, which is a navigable water that flows into Clear Creek, then Clear Lake, and onto Galveston Bay. It is immediately to the north of Bayou Brae, a middle class neighborhood built in the 1960s along Robinson Bayou.

26.     FEMA's flood maps, updated in 2018, place most of the Broad Reach property within the 100-year floodplain.[1]

27.     For decades, the property was undeveloped. Aerial imagery from 1944 shows a densely forested tract with visible wetlands stretching from Robinson Bayou into the center of the property. In the image below, sunlight reflects off water throughout the site.



28.     Broad Reach bought the property in 2004.

29.     In 2006, the U.S. Fish & Wildlife Service identified more than 9.5 acres of wetlands on the tract and added them to the National Wetlands Inventory. The FWS

_____

[1]                          FEMA          Flood          Map          Service          Center, https://msc.fema.gov/portal/search?AddressQuery=-95.078393%2C%2029.528467#searchresultsanchor (last visited July 14, 2020).

classified 0.80 acres as estuarine and marine wetland habitat and 8.77 acres as freshwater

forested/shrub wetland habitat.



30.     Also in 2006, relying on a wetland delineation provided by Broad Reach's

consultant, the Corps issued an AJD—later questioned by EPA as inadequate—that

identified only 1.35 acres of wetlands on the property as jurisdictional.

31.     In 2012 and 2013, Broad Reach sought a permit from the Corps under Section 404

of the Clean Water Act. Broad Reach "proposed to fill 1.08 acres of jurisdictional

adjacent tidal wetlands, 0.56 acres of jurisdictional Waters of the U.S., and 0.03 acres of

jurisdictional headwater wetlands." Broad Reach also proposed excavating "0.30 acres of

jurisdictional adjacent tidal wetlands, 0.31 acres of jurisdictional Waters of the U.S., and

0.08 acres of headwater wetland areas." To compensate for "unavoidable impacts to 2.36

acres of jurisdictional areas," Broad Reach proposed establishing "3.04 acres of tidally influenced wetlands within a proposed off-site wetland establishment area within Robinson Bayou adjacent to the project site." In the application, Broad Reach disregarded most wetlands on its property affected by its proposed development, including forested wetlands identified in the National Wetlands Inventory that were connected to the jurisdictional "headwater wetlands" that they identified.

32.     Federal and state agencies raised serious concerns in written comments to Broad Reach's permit application.

33.     EPA noted that the National Wetlands Inventory reflected "8.77 acres of forested wetlands located on the property, adjacent to the headwater streams, in addition to the tidal emergent wetlands and waters of the U.S. These potential wetland resources are not represented in the applicant's wetland delineation. Due to the significant discrepancy between the [National Wetlands Inventory] data and the delineated resources, the EPA requests that the Corps of Engineers verify the wetland delineation for the site, which has not yet been done… All wetlands on the property should be accurately represented for purposes of determining the least damaging practicable alternative and mitigation requirements."  EPA also asked Broad Reach to consider alternative, non-wetland locations for its project, avoid and minimize impacts to waters of the U.S., and provide a plan to conduct non-water dependent activities in uplands—all requirements under the Clean Water Act, which had not been met.

11

34.     The U.S. Fish and Wildlife Service raised similar concerns as EPA.

35.     The Texas Commission on Environmental Quality ("TCEQ") raised similar concerns and cautioned it could not make a required water quality certification. TCEQ recommended that Broad Reach submit a plan to mitigate for wetlands that would be lost.

36.     To address some of these concerns, in early 2014, the Corps visited the site and "Additional areas were identified on the tract that met the three criteria of a wetland… Additional areas with low geomorphic position contained sediment deposits, hydrophytic vegetation and soil mottling." The Corps asked Broad Reach's consultant to "re-delineate the tract and submit correct wetland delineation verification."

37.     By March 2014, citing Broad Reach's failure to resolve the issues raised by federal and state agencies, the Corps withdrew Broad Reach's permit application.

38.     As of March 2014, the tract still appeared densely forested and undeveloped:



39.     Despite failing to meet the requirements needed to obtain a federal permit, Broad Reach began clearing trees in late 2014.

40.     In early 2015, the development came to a halt while the Corps investigated a complaint about unauthorized activity on the site. Relying on Broad Reach's paid consultant, and presumably the improper wetland delineation prepared by this same consultant, the Corps concluded that initial clearing activities did not affect any of the wetlands that Broad Reach had determined were jurisdictional. The Corps did not inspect any impacts to the 8.77 acres of wetlands contained on the National Wetlands Inventory.

41.     Soon after the Corps' investigation ended, Broad Reach began more aggressively clearing the property of trees and other vegetation. Google Earth shows a significant loss of trees between April 2014 and March 2015.

42.     In March 2015, even after some tree clearing, a stream, comprising the jurisdictional "headwater wetlands" identified by Broad Reach and recognized by the Corps during Broad Reach's failed permitting process, is visible in Google Earth imagery. Several vehicle ruts show water on the site, as indicated below in blue:



43.     In June 2018, Broad Reach requested that the Corps approve a wetland delineation

prepared by its own consultants and identified only 1.06 jurisdictional wetlands. The

request relied on outdated floodplain data, excluded the headwater wetlands previously

identified as jurisdictional, relied on photos of vegetation that had already been cleared

and on aerial imagery taken after the wetlands were already substantially filled, and made

no mention of the National Wetlands Inventory data or previous failed permit request. In

the "Routine Wetland Determination Data Form" provided with the request, Broad

Reach's consultant left blank a request for information about the property's "NWI

[National Wetlands Inventory] classification." Broad Reach's consultants did not disclose

that the wetlands had already been filled.

44.     Around the same time, the Corps received another complaint of unauthorized

activity.

45.     In August 2018, Broad Reach's consultant represented that the headwater wetland

areas were no longer present and represented that no fill material was discharged into the

area.

46.     In September 2018, the Corps noted that "mechanized land clearing and discharge

of fill material" on the Broad Reach site severely limited their ability to conduct a

traditional wetland analysis.

47.     A site visit in November 2018 showed that manmade drainage ditches had been

constructed in the area and despite the extensive fill added to the property, identified an

additional wetland area not disclosed by Broad Reach.

48.     By 2019, the tract appeared to be stripped of trees, and much of the previous

wetland area, including the jurisdictional "headwater wetlands," had been filled:



49.     The January 2019 photo below shows a sediment plume migrating from the site

into the lagoon and wetland next to the site and Robinson Bayou. By filling and regrading

much of the area containing wetlands documented in the National Wetlands Inventory,

Broad Reach caused muddy water to flow over the site, into the jurisdictional wetlands,

and Robinson Bayou.



50.     On April 5, 2019, the Corps issued an AJD to Broad Reach that identified 1.24

acres of jurisdictional wetlands and a separate 0.25-acre wetland that the Corps deemed

as non-jurisdictional. This AJD identifies three distinct wetlands, compared to 11

identified in the 2006 delineation that the EPA already had suggested was inadequate.

The AJD entirely omitted the "headwater wetlands" contained in Broad Reach's permit

application, which were located within the 100-year floodplain and connected the

forested wetlands identified in the National Wetlands Inventory to Robinson Bayou and the wetlands immediately next to the bayou.

51.     The Corps emailed EPA to confer regarding one 0.25-acre non-jurisdictional wetland. EPA responded less than 3 hours later agreeing with the Corp's assessment. The EPA did not ask about, and the Corps did not seek EPA's input on, the other wetlands omitted from jurisdiction.

52.     In June 2019, Bayou City Waterkeeper and Healthy Gulf, another non-profit organization that is based in New Orleans, Louisiana, sent a letter to the Corps and EPA that details the problems with the AJD, outlined in this complaint. No action was taken.

53.     As of mid-2019, the tract had been cleared of almost all trees, and most of the site has been built up with fill material.

54.     Broad Reach has continued to develop the property, and no plans for mitigation are in place. Bayou Brae residents, including members of Bayou City Waterkeeper, continue to express concerns about Broad Reach's project.

VII. Legal Framework

55.     In 1972, Congress enacted the Clean Water Act to regulate "navigable waters." *See* 33 U.S.C § 1251, *et seq.*

56.     Section 502(7) of the Clean Water Act defines "navigable waters" to mean the "waters of the United States, including the territorial seas." 33 U.S.C § 1362(7).

57.     Section 301(a) of the Clean Water Act prohibits the unpermitted discharge of dredged and fill material into "navigable waters." 33 U.S.C. § 1311(a).

58.     Section 404 of the Clean Water Act authorizes the Secretary of the Army, through the Corps, to issue permits for the discharge of dredged and fill material into "navigable waters." 33 U.S.C. § 1344.

59.     The term "navigable waters" has long been understood to encompass some, but not all, wetlands in the United States. *See United States v. Riverside Bayview*, 474 U.S. 121 (1985) (confirming the federal government's power to regulate intrastate wetlands as waters of the United States).

60.     According to the Corps and EPA, wetlands are "[t]hose areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas." U.S. Army Corps of Engineers, Wetlands Delineation Manual, at 9 (1987) ("1987 Wetlands Manual"). In evaluating the presence of wetlands, the Corps looks at three factors: (1) vegetation, (2) soil, and (3) hydrology. *Id.* at 9-10.

61.     When a wetland already has been filled as a result of the removal of vegetation or unauthorized fill, the Corps has identified special procedures for assessing the previous presence of wetlands. *See id.* at 73-82.

62.     With regard to vegetation, the Corps must (i) describe the type of alteration, (ii) described the effects of the alteration on vegetation, (iii) determine the type of vegetation that previously occurred by, for example, evaluating aerial photography from the last five years and consulting the National Wetlands Inventory map;[2] (iv) determine whether plant community types constitute hydrophytic vegetation. *Id.* at 73-77.

63.     With regard to soil, the Corps must follow similar procedures: (i) describe the type of alteration, looking, for example, the deposition of fill material and removal of surface layers; (ii) describe the effect on soils; (iii) characterize the soils that previously occurred; and (iv) determine whether hydric soils were formerly present. *Id.* at 77-79.

64.     When evaluating the previous hydrology of filled wetlands, the Corps must (i) describe the type of alteration by considering factors such as the filing of channels or depressions, the diversion of water, and groundwater extraction; (ii) describe the effects of alteration on area hydrology; (iii) characterize the hydrology that previously existed in the area by consulting data such as aerial photography, historical records, and floodplain management maps; and (iv) determine whether wetland hydrology previously occurred. *Id.* at 80-82.

65.     In *Rapanos v. United States*, 547 U.S. 715 (2006), the U.S. Supreme Court clarified when wetlands fall within the scope of the Clean Water Act's protections.

---

[2] With regard to this factor, "[t]o develop the strongest possible record, all of the [listed] sources should be considered." 1987 Wetlands Manual at 76.

66.     Four justices, in a plurality opinion authored by Justice Scalia, agreed that the

agencies' regulatory authority should extend to "wetlands with a continuous surface

connection to" navigable waters and their tributaries. *Id.* at 742.

67.     In a concurring opinion, Justice Kennedy recognized that jurisdiction could extend

to wetlands that were hydrologically connected to waters of the United States. Justice

Kennedy reasoned:

> Wetlands can perform critical functions related to the integrity of other
> waters—functions such as pollutant trapping, flood control, and runoff storage.
> 33 CFR § 320.4(b)(2). Accordingly, wetlands possess the requisite nexus, and
> thus come within the statutory phrase "navigable waters," if the wetlands,
> either alone or in combination with similarly situated lands in the region,
> significantly affect the chemical, physical, and biological integrity of other
> covered waters more readily understood as "navigable."

*Id.* at 779-80.

68.     In 2008, after public comment, the EPA and Corps issued a memorandum to

address jurisdiction over waters of the United States under the Clean Water Act, as

clarified by the *Rapanos* opinion ("Rapanos Memo").[3] The Rapanos Memo was in place

at the time the Corps issued the AJD.

69.     The Rapanos Memo outlined the Corps' jurisdiction over wetlands in several

circumstances: (i) wetlands adjacent to a navigable water; (ii) wetlands abutting a

tributary of a navigable water; and (iii) on a case-by-case basis, wetlands with a

"significant nexus" to a navigable water, including "Wetlands adjacent to non-navigable

---

[3] EPA & Corps, Clean Water Act Jurisdiction Following the U.S . Supreme Court's Decision in Rapanos v. United States & Carabell v. United States (2008), https://www.epa.gov/sites/production/files/2016-02/documents/cwa_jurisdiction_following_rapanos120208.pdf.

tributaries that are not relatively permanent" and "Wetlands adjacent to but that do not

directly abut a relatively permanent nonnavigable tributary."

70.     The Rapanos Memo relies on the definition of adjacency then established under

the Code of Federal Regulations: 'bordering, contiguous, or neighboring.'" (Citing 33

C.F.R. § 328.3(c), before recent amendments).

71.     The Rapanos Memo identifies criteria, any of which could be met to show

adjacency as defined under 33 C.F.R. § 328.3(c), including (i) "there is an unbroken

surface or shallow sub-surface connection to jurisdictional waters. This hydrologic

connection may be intermittent"; and (ii) "their proximity to a jurisdictional water is

reasonably close, supporting the science-based inference that such wetlands have an

ecological interconnection with jurisdictional waters." (Citing *United States v. Riverside*

*Bayview Homes. Inc.*, 474 U.S. 121, 134 (1985) ("...the Corps' ecological judgment about

the relationship between waters and their adjacent wetlands provides an adequate basis

for a legal judgment that adjacent wetlands may be defined as waters under the Act.").

With regard to the second criterion listed, the Rapanos Memo elaborates: "Because of the

scientific basis for this inference, determining whether a wetland is reasonably close to a

jurisdictional water does not generally require a case-specific demonstration of an

ecologic interconnection. In the case of a jurisdictional water and a reasonably close

wetland, such implied ecological interconnectivity is neither speculative nor

insubstantial...." Further, "In assessing whether a wetland is reasonably close to a

jurisdictional water, the proximity of the wetland... in question will be evaluated and shall not be evaluated together with other wetlands in the area."

72.　　The Rapanos Memo also explains: "A significant nexus analysis will assess the flow characteristics and functions of the tributary itself and the functions performed by all wetlands adjacent to the tributary to determine if they significantly affect the chemical, physical and biological integrity of downstream traditional navigable waters. Significant nexus includes consideration of hydrologic and ecologic factors."

73.　　By regulation, the Corps may determine whether a particular parcel of property contains "waters of the United States" by issuing an AJD. 33 C.F.R. §§ 320.1(a)(6), 331.2. AJDs are defined as "a Corps document stating the presence or absence of waters of the United States on a parcel or a written statement and map identifying the limits of waters of the United States on a parcel." 33 C.F.R. § 331.2.

74.　　The basis of an AJD "is a summary of the indicators that support the Corps approved JD. Indicators supporting the Corps approved JD can include, but are not limited to: indicators of wetland hydrology, hydric soils, and hydrophytic plant communities; indicators of ordinary high water marks, high tide lines, or mean high water marks; indicators of adjacency to navigable or interstate waters; indicators that the wetland or waterbody is of part of a tributary system; or indicators of linkages between isolated water bodies and interstate or foreign commerce." 33 C.F.R. § 331.2.

75.     Individuals or organizations with standing may challenge an AJD made by the Army Corps under the Administrative Procedure Act. *U.S. Army Corps of Engineers v. Hawkes*, 136 S. Ct. 1807 (2016) (judicial review available because AJDs are final agency actions under the APA).

76.     Under the APA, the reviewing court may "hold unlawful and set aside agency action, findings, and conclusions found to be… arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(A).

77.     An agency action is arbitrary and capricious "if the agency… entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

### VIII. First Claim for Relief
(Administrative Procedure Act Section 706(2): The Corps acted arbitrarily and capriciously in issuing the AJD to Broad Reach)

78.     All paragraphs above are reincorporated by reference.

79.     The Administrative Procedure Act provides for judicial review of final agency action. This Court must "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2).

80.     In light of the requirements of the Clean Water Act and relevant regulations and practices, the Corps' actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" because:

    a.  When the wetlands on Broad Reach's property had not yet been filled, the Corps previously withdrew Broad Reach's permit application, citing Broad Reach's failure to resolve EPA's and other agencies' concerns regarding the wetland delineation. Yet after the wetlands had been filled, the Corps sanctioned Broad Reach's actions by issuing an AJD, without addressing the EPA's or other agencies' concerns.

    b.  The Corps issued the AJD in April 2019 only after Broad Reach had filled and regraded almost the entire site—destroying the best evidence of wetlands on the site (the wetlands themselves)—and despite Broad Reach's actions, the Corps deferred to wetlands data prepared by Broad Reach's consultants instead of conducting its own independent analysis.

    c.  In issuing the AJD, the Corps did not address concerns raised by the EPA, FWS, and TCEQ during the permit application process, and did not consult with the EPA, except with respect to one "isolated" wetland.

    d.  In issuing the AJD, the Corps omitted the headwater wetlands it previously had deemed jurisdictional.

e.  In issuing the AJD, the Corps ignored wetlands within the 100-year floodplain and connected by the so-called headwater wetlands to jurisdictional wetlands and ignored other indicators showing the presence of jurisdictional wetlands.

f.  The Corps issued the AJD in response to concerns raised by Bayou Brae residents and allowed Broad Reach to avoid public scrutiny and circumvent the permit process that it previously could not comply with.

81.   Because the Corps violated the Administrative Procedure Act when issuing the AJD, the Court must hold unlawful and set aside the AJD as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

## IX. Requested Relief

82.   Bayou City Waterkeeper respectfully asks the Court to enter:

a.  A declaration that the Corps' issuance of the AJD was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" because:

i.  When the wetlands on Broad Reach's property had not yet been filled, the Corps previously withdrew Broad Reach's permit application, citing Broad Reach's failure to resolve EPA's and other agencies' concerns regarding the wetland delineation. Yet after the wetlands had been filled, the Corps sanctioned Broad

Reach's actions by issuing an AJD, without addressing the EPA's or other agencies' concerns.

ii. The Corps issued the AJD in April 2019 only after Broad Reach had filled and regraded almost the entire site—destroying the best evidence of wetlands on the site (the wetlands themselves)—and despite Broad Reach's actions, the Corps deferred to wetlands data prepared by Broad Reach's paid consultants instead of conducting its own independent analysis.

iii. In issuing the AJD, the Corps did not address concerns raised by the EPA, FWS, and TCEQ during the permit application process, and did not consult with the EPA, except with respect to one "isolated" wetland.

iv. In issuing the AJD, the Corps omitted the headwater wetland areas it previously had deemed jurisdictional.

v. In issuing the AJD, the Corps ignored wetlands within the 100-year floodplain and connected by a stream to jurisdictional wetlands and ignored other indicators showing the presence of jurisdictional wetlands.

vi. The Corps issued the AJD in response to concerns raised by Bayou Brae residents and allowed Broad Reach to avoid public

scrutiny and circumvent the permit process that it previously could not comply with.

b. An order vacating or otherwise setting aside the AJD as unlawful under 5 U.S.C. § 706.

c. An award of attorney's fees, to the extent allowed by law under 28 U.S.C. §2412(d)(1)(A), together with expenses, and costs; and

d. Any other relief that the Court deems proper in the circumstances of this case to redress Bayou City Waterkeeper and its members' injuries.

Date: August 4, 2020.

*/s/ Kristen Schlemmer*
Kristen Schlemmer
Attorney-in-charge
Tex. Bar No. 24075029
S.D. Tex. Bar No. 2078411
Bayou City Waterkeeper
2010 N. Loop West, Suite 103
Houston, TX 77018
(713) 714-8442, ext. 2
kristen@bayoucitywaterkeeper.org
*Attorney for Bayou City Waterkeeper*

Of counsel:
Parth Gejji
Tex. Bar No. 24087575
S.D. Tex. Bar No. 2917332
Beck Redden LLP
1221 McKinney St Ste 4500
Houston, TX 77010-2029
(713) 951-6288
pgejji@beckredden.com
*Attorney for Bayou City Waterkeeper*
