United States District Court
Southern District of Texas
**ENTERED**
September 06, 2022
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| BAYOU CITY WATERKEEPER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 3:20-cv-00255 |
| | § | |
| U.S. ARMY CORPS OF ENGINEERS, | § | |
| *et al.*, | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM AND RECOMMENDATION</u>

Pending before me are competing motions for summary judgment. *See* Dkts. 38 and 40. Having reviewed the motions, the responses, the replies, the summary judgment record, and the applicable law, I recommend that Defendants' motion be **GRANTED** and Plaintiff's motion be **DENIED**.

## I.     INTRODUCTION

This lawsuit concerns approximately 30 acres of land located next to Robinson Bayou in League City, Texas (the "Property"). The land in question is owned by Broad Reach Partners LP ("Broad Reach"), a real-estate developer that intends to develop a single-family residential subdivision. Plaintiff Bayou City Waterkeeper ("BCW"), a Houston-based non-profit environmental organization, brings this case against the United States Army Corps of Engineers (the "Corps") and several individual government employees acting in their official capacities (collectively, "Defendants").[1]

---

[1] Originally, BCW filed suit against Ryan McCarthy as the Secretary of the Army; Lieutenant General Todd T. Semonite, who was serving as the Chief and Commander of the Corps; and Colonel Timothy R. Vail, as the Galveston Corps District Commander. Ryan McCarthy and Lieutenant General Semonite have since been replaced. The current Secretary of the Army, Christine Wormuth, and the current Chief and Commander of the Corps, Lieutenant General Scott A. Spellmon, have been substituted as parties to this case under Federal Rule of Civil Procedure 25(d). Colonel Vail still serves as the Galveston Corps District Commander and remains a party to this case.

As explained in greater detail below, BCW challenges the Corps' 2019 jurisdictional determination that the Property contains 3.03 acres of "waters of the United States" subject to regulation under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq*. More specifically, BCW challenges the Corps' refusal to assert jurisdiction over roughly one-third of the Property, which it contends are wetlands subject to federal regulatory jurisdiction. BCW argues that the Corps' determination that the Property includes only 3.03 acres of jurisdictional waters is arbitrary and capricious, an abuse of discretion, or otherwise violates the CWA.

BCW seeks declaratory and other injunctive relief pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, and the CWA for the alleged violations. At a big-picture level, BCW asks that I vacate the jurisdictional determination because the Corps refused to examine the relevant data or articulate a satisfactory explanation for its decision. *See* Dkt. 12 at 28.

## II.    REGULATORY FRAMEWORK

To explain the facts of this case, some legal background of the relevant statutory and regulatory landscape is necessary.

### A.    THE CLEAN WATER ACT

The CWA is a comprehensive statute designed "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To that end, the CWA prohibits the discharge of pollutants, including dredging or fill materials, into navigable waters unless the discharges are made pursuant to statutorily authorized permits. *See id.* § 1311(a).

The term "navigable waters" encompasses "the waters of the United States," a phrase that the regulations define to include both traditionally navigable waters—like rivers and lakes—and some waters that are not practically navigable—such as certain wetlands. *See id.* § 1362(7). The contours of the phrase "waters of the United States" have, to put it mildly, been the source of much confusion and controversy. *Rapanos v. United States*, 547 U.S. 715, 719–57 (2006) (plurality opinion). *See also Sackett v. EPA*, 566 U.S. 120, 132 (2012) (Alito, J., concurring)

2

("The reach of the Clean Water Act is notoriously unclear."). Current jurisprudence reveals that the CWA's regulatory jurisdiction extends to waters falling somewhere between "transitory puddles or ephemeral flows of water," *Rapanos*, 547 U.S. at 733 (plurality), and traditionally navigable waters.

Though "[t]he outer limit of the phrase 'waters of the United States' remains fuzzy," *Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 230 n.3 (5th Cir. 2015), whether a body of water is subject to the CWA's regulatory jurisdiction carries significant real-world consequences for landowners. Indeed, the CWA "imposes substantial criminal and civil penalties for discharging any pollutant into waters covered by the [CWA] without a permit from the Corps." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 594 (2016) (citing 33 U.S.C. §§ 1311(a), 1319(c), (d), 1344(a)).

## B.   THE PERMITTING PROCESS

Section 404 of the CWA authorizes the Corps to regulate, by permit, discharges of dredged and fill material into jurisdictional waters. *See* 33 U.S.C. § 1344. The Corps issues permits in accordance with requirements imposed by Corps regulations, *see* 33 C.F.R. §§ 320.1 *et seq.*, as well as Environmental Protection Agency ("EPA") § 404(b)(1) guidelines. *See* 40 C.F.R. §§ 230.1 *et seq*. Individual permits are issued on a case-by-case basis after a resource-intensive process that involves extensive site-specific documentation and review, an opportunity for public hearing, and a public-interest review.

"The costs of obtaining such a permit are significant," not to mention time-consuming. *Hawkes*, 578 U.S. at 594. As part of the process, the Corps' regulations impose a detailed set of responsibilities concerning mitigation on the permittee. The required "compensatory mitigation plan" mandates not only discussion of plan objectives, site selection, legal arrangements necessary over the life of the plan, and the project site's ecological baseline, but also demands an actual work plan be formulated, which must include "[d]etailed written specifications and work descriptions" of the project. 40 C.F.R. § 230.94(c).

The list goes on, but suffice to say, this process can be protractive and prohibitively expensive. *See Hawkes*, 578 U.S. at 594 (explaining that a study for the specialized permit at issue found the average applicant spent 788 days and $271,596 completing the permitting process without taking into consideration mitigation or design-change costs).

## C.   JURISDICTIONAL DETERMINATIONS

Recognizing that "[i]t is often difficult to determine whether a particular piece of property contains waters of the United States," *id.*, the regulations authorize the Corps to issue landowners "jurisdictional determinations" ("JDs"), which the regulations define as "written Corps determination[s] that a wetland and/or waterbody is subject to regulatory jurisdiction under . . . the Clean Water Act." 33 C.F.R. § 331.2.

The Corps makes JD decisions on a case-by-case basis. *See Hawkes*, 578 U.S. at 595. The process, however, is not as arduous as the § 404 permitting process. Namely, there is no public comment period, and the Corps is required to consult with other agencies only under limited circumstances. Rather, the Corps tasks its district engineers to conduct an evaluation considering various standardized techniques, methodologies, and procedures. *See* 33 C.F.R. § 320.1(a). Because the variability of natural geography and other hydrologic and ecologic factors can complicate the task of identifying "waters of the United States," the Corps has also provided its engineers with comprehensive guidance to assist in its jurisdictional determinations. *See, e.g.*, Dkt. 40-2 (*Rapanos* Guidance); CAR[2] at 971–1113 (1987 Corps of Engineers Wetlands Delineation Manual); CAR at 681–860 (2010 Regional Supplement to the Corps of Engineers Wetlands Delineation Manual: Atlantic and Gulf Coastal Plain Region (Version 2.0)).

---

[2] "CAR" stands for "Corrected Administrative Record." The CAR was provided to the Court on a flash drive. *See* Dkt. 35. A certified index of the documents in the CAR is available for public review. *See* Dkt. 34-2.

JDs come in two forms: (1) preliminary; and (2) approved. Preliminary JDs merely advise a property owner "that there may be waters of the United States on a parcel." 33 C.F.R. § 331.2. An approved JD ("AJD"), on the other hand, definitively "stat[es] the presence or absence" of such waters. *Id.* Once issued, an AJD is binding for five years on both the Corps and the EPA and constitutes a "final agency action" for purposes of the APA. *See Hawkes*, 578 U.S. at 595.

The JD process provides a middle ground for concerned or cautious landowners who want to dredge, fill, or discharge water on their land. Rather than risk fines or endure the permit-application process before undertaking any activity that would disturb those waters, landowners can seek an AJD from the Corps. If the Corps determines the waters to be jurisdictional, the landowner must seek a permit before commencing any activity that will affect them.

## III.   FACTS

### A.   THE 2006 AJD

In March 2005, environmental-engineering firm Berg Oliver Associates, Inc. ("Berg Oliver") submitted a JD request on behalf of The Preserve on Robinson Bayou Ltd. ("The Preserve"), which owned the Property at that time. *See* CAR at 911. In support of the request, Berg Oliver provided a wetland delineation assessment, which identified 3.28 acres of jurisdictional waters—(i) 1.79 acres of waters of the United States; (ii) 1.38 acres of adjacent jurisdictional wetlands; and (iii) 0.11 acres of headwater wetlands. *See* CAR at 914. *See generally* CAR at 912–70. After conducting a site visit with Corps personnel, Berg Oliver provided additional information, including an updated delineation map showing slightly fewer adjacent jurisdictional wetlands (1.35 acres). *See* CAR at 893.

In June 2006, after conducting its own verification and review of available data—including an infrared aerial photograph, soil survey, the United States Geographical Survey ("USGS") topographic map, the National Wetlands Inventory ("NWI") map created by the United States Fish and Wildlife Service ("USFWS"), and the Federal Emergency Management Agency ("FEMA") flood insurance rate

map—the Corps issued an AJD (the "2006 AJD"). *See* CAR at 885–89. The 2006 AJD concurred with Berg Oliver's JD assessment and determined the Property contained 3.25 acres of jurisdictional waters—(i) 1.79 acres of waters of the United States; (ii) 1.35 acres of adjacent wetlands; and (iii) 0.11 acres of headwater wetlands. *See* CAR at 887. I've included a copy of the wetland delineation map below:



CAR at 884.

"Just as Berg Oliver and the Corps finalized the 2006 AJD," Dkt. 38 at 9, the USFWS determined the Property contained 8.77 acres of freshwater forested/shrub wetland habitat and added those wetlands to the NWI. *See* CAR at 1121.

Though it is not exactly clear when, at some point after the issuance of the 2006 AJD, Broad Reach acquired the Property from The Preserve. The 2006 AJD expired after five years, and the land remained undeveloped.

6

**B.** **SECTION 404 PERMITTING EFFORTS**

In May 2012, Broad Reach applied for a § 404 permit to dredge or fill 1.367 acres of wetlands and other jurisdictional waters identified in the 2006 AJD for the stated purpose of constructing a single-family residential development. *See* CAR at 658–80. In September 2012, the Corps sought additional information regarding Broad Reach's permit application, due within 30 days. *See* CAR at 652. Because it did not receive the requested information within that time period, the Corps withdrew Broad Reach's application without prejudice. *See* CAR at 651–52.

In June 2013, Broad Reach submitted a second § 404 application, this time seeking to dredge or fill 1.67 acres of wetlands and other jurisdictional waters. *See* CAR at 611. Broad Reach's application included, in part, the expired 2006 AJD, as well as materials Broad Reach had submitted in support of its prior JD request. *See* CAR at 609–50. BCW complains that Broad Reach's § 404 application "did not disclose the addition of 8.77 acres of forested wetlands to the NWI." Dkt. 38 at 9.

In November 2013, in accordance with 33 C.F.R. § 325.3, the Corps invited public comment on Broad Reach's permit application. *See* CAR at 491–512. Federal and state agencies with legal oversight over environmental issues impacted by Broad Reach's proposed development, along with residents of the adjacent neighborhood, lodged several grievances. *See* CAR at 460–67 (Texas Commission on Environmental Quality); CAR at 477–78 (EPA); CAR at 479–81 (USFWS); CAR at 483 (Texas General Land Office); CAR at 470–72 (residents).

In December 2013, after the comment period closed, the Corps requested that Broad Reach respond to the comments and supply additional wetland delineation data. *See* CAR at 458–59. Berg Oliver responded on Broad Reach's behalf on January 21, 2014. *See* CAR at 448–57. It appears Berg Oliver supplemented its response on January 29, 2014. *See* CAR at 438–47. On February 19, 2014 the Corps, along with representatives of the USFWS and Berg Oliver, conducted a site visit, after which the Corps "requested Berg Oliver re-delineate the tract and submit a corrected wetland delineation verification." CAR at 437.

On February 21, 2014, the Corps sent another letter notifying Broad Reach that its responses to the comments were "not sufficient to address the agencies, public, and Corps concerns." CAR at 430. The Corps' February 21 letter identified additional information necessary to complete its evaluation of Broad Reach's permit application and warned that failure to respond within 30 days would result in the withdrawal of the application. *See* CAR at 430–32.

On March 21, 2014, Berg Oliver submitted a lengthy response. *See* CAR at 327–427. Included in its response was a new wetland delineation map, per the Corps' request, which identified 1.79 acres of jurisdictional wetlands—0.12 acres more than reflected in Broad Reach's 2013 permit application. *See* CAR at 427. However, the information provided did not fully respond to the public comments or the Corps' concerns, so the Corps withdrew Broad Reach's permit application without prejudice to reapply. *See* CAR at 325–26.

In late 2014 or early 2015, BCW alleges Broad Reach "began clearing trees to prepare the site for development." Dkt. 38 at 11. On January 12, 2015, the Corps received an "unauthorized activity" complaint from a concerned citizen. CAR at 303. The Corps contacted Broad Reach's President, Al Parrish ("Parrish"), who told the Corps that he was forced to clear the vegetation along the property boundaries after League City issued a citation and decided to remove some of the underbrush "while he had the equipment on site." CAR at 288. The Corps notified Parrish that it "would probably make a site visit [to] inspect the clearing activities." CAR at 288.

On February 20, 2015, the Corps, accompanied by a representative from Berg Oliver, performed a site visit and found no CWA violation. The investigation report states that the wetlands (presumably those wetlands identified in the 2006 AJD) "were not impacted by the land clearing activities," noting that the "project site still had flags marking" the wetlands. CAR at 280–81. BCW complains that "[t]he Corps did not inspect the 8.77 acres of NWI wetlands" during the February 20 site visit. *See* Dkt. 38 at 11.

## C.    THE 2019 AJD

In June 2018, Broad Reach requested a wetland delineation verification from the Corps—i.e., a jurisdictional determination. *See* CAR at 180–279. With its request, Broad Reach submitted a wetland delineation that was created by Berg Oliver in May 2018 using the 2010 Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Atlantic and Gulf Coastal Plain Region (Version 2.0). *See* CAR at 184. *See also* CAR at 681–860. As with the 2005 JD request, Berg Oliver conducted an on-site assessment and considered various methodologies, such as soil surveys, floodplain data, topographic maps, and aerial photography. *See* CAR at 183.

The 2018 delineation materials claimed that the Property included 1.06 acres of jurisdictional wetlands and 1.79 acres of waters of the United States—totaling 2.85 acres of jurisdictional waters. *See* CAR at 180. Berg Oliver's 2018 assessment found that 0.40 acres of jurisdictional waters previously identified in the 2006 AJD were no longer jurisdictional. *See* CAR at 180. These previously identified jurisdictional waters consisted of a tributary that, in 2006, flowed from the center of the Property toward Robinson Bayou. *See* CAR at 884.

On August 1, 2018, the Corps contacted Berg Oliver to inquire about the omission of the jurisdictional waters it had previously identified in the 2006 AJD. According to the Corps' file, Berg Oliver stated that "the tributary [was] no longer present" but assured the Corps that "fill material was not discharged into the tributary." CAR at 167. Based on a review of aerial photographs, the Corps determined that "[a] site visit [was] warranted to verify the delineation and investigate the alleged unauthorized activity."[3] CAR at 167.

---

[3] The Corps received a second unauthorized activity report on July 2, 2018. *See* CAR at 168. That report, submitted anonymously, complained of the "clearing of trees + potential changes in elevation [expected] to take place" on the east end of the Property opposite the bayou. CAR at 168. It is unclear whether the Corps' file's mention of "alleged unauthorized activity" refers to this July 2 unauthorized activity report or some other sort of unauthorized activity.

The Corps conducted a site visit on September 27, 2018. *See* CAR at 91–118. Accompanying the three Corps engineers were representatives from Broad Reach and Berg Oliver. *See* CAR at 91. The Corps' report found that "[t]he tributary identified on the previous delineation no longer exhibited an ordinary high water mark" and "resemble[d] a swale." CAR at 91. The Corps also determined that "a fringe wetland [was] present along Robinson Bayou . . . and [needed] to be added to the revised delineation." CAR at 91. However, the Corps noted that the area labeled as "DP02"[4] that "was previously a wetland" had been "disturbed by previous mechanized land clearing and contained fill material." CAR at 92. According to the field notes, Berg Oliver stated that it was willing to remove the fill material. *See* CAR at 92.

In October 2018, Berg Oliver provided supplemental information requested by the Corps. *See* CAR at 119–65. In its supplement, Berg Oliver identified two additional wetlands totaling 0.43 acres—0.18 acres of adjacent jurisdictional wetlands and 0.25 acres of isolated wetlands. *See* CAR at 120. Berg Oliver further explained its determination that the previously identified tributary should no longer be considered "waters of the United States," stating that: (1) "the feature does not carry flow or transport sediment"; (2) "the feature does not and did not contain an [ordinary high-water mark]"; and (3) the "historical flow on the tract was cut off decades ago and the feature can no longer receive off-site flow." CAR at 121. This conclusion was supported by a technical opinion letter prepared by a third-party environmental consultant firm. *See* CAR at 142–52. Finally, as for evidence of the alleged unauthorized activity, Berg Oliver again explained that Broad Reach was required to clear the land and mow in 2014 to comply with League City regulations but stated that it had monitored those clearing activities to ensure that jurisdictional waters were not affected. *See* CAR at 121. Since then,

---

[4] DP02—or "data point two"—is identified by its global address: 29.529015° -95.078346°. *See* CAR at 101. According to Google Earth, DP02 is located on the northwest portion of the Property, near the bayou and adjacent jurisdictional wetlands, approximately where the former tributary connected with the adjacent jurisdictional wetlands. *See* CAR at 106.

according to Berg Oliver, Broad Reach had only maintained the Property to avoid additional citations. *See* CAR at 121.

On March 19, 2019, FEMA issued a press release, notifying the public that it had finalized its new flood maps for Galveston County (the "2019 FEMA map"). *See* CAR at 56–57. However, the press release expressly stated that the new flood maps would not go into effect until August 15, 2019. *See* CAR at 57. The 2019 FEMA map places a sizeable portion of the 30-acre tract in the 100-year floodplain. *See* Dkt. 38-1.

Later in March 2019, the Corps prepared a draft AJD. *See* CAR at 25–27. Because the Corps considered the 0.25 acres of wetlands identified by Berg Oliver to be "isolated," jurisdiction did not attach to those wetlands under 33 C.F.R §§ 330.2(e), 328.3. *See* CAR at 26. The Corps finding was, at least in part, based on its determination that those wetlands were "outside the 100-year floodplain of the Robinson Bayou." CAR at 126. On April 2, 2019, in accordance with the *Rapanos* Guidance,[5] the Corps shared its findings and consulted with the EPA regarding the jurisdictional status of isolated wetlands. *See* CAR at 12–13. The EPA agreed with the Corps' assessment that the 0.25 acres of isolated wetlands were not jurisdictional and signed off on the draft AJD. *See* CAR at 12 ("We have reviewed the information provided and will take no further action regarding this draft JD.").

On April 5, 2019, the Corps issued an AJD (the "2019 AJD"), which determined the tract of land contained 3.03 acres of jurisdictional waters—(i) 1.79 waters of the United States; and (ii) 1.24 acres of adjacent jurisdictional wetlands. *See* CAR 6–11. The 2019 AJD does not include a wetland delineation map; however, I've included Berg Oliver's revised wetland delineation map below, which is consistent with the 2019 AJD's findings:

---

[5] *Rapanos* Guidance is explained in Section IV(B)(2), below.



CAR at 124.

## IV.    LEGAL STANDARD

### A.    SUMMARY JUDGMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Where, as here, a party seeks judicial review of a federal agency action under the APA, the action will not be set aside unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This arbitrary and capricious standard "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Fifth Circuit has stressed: "Under this highly deferential standard of review, a reviewing court has the least latitude in finding grounds for reversal." *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 678 (5th Cir. 1992) (quotation omitted).

"Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the

facts found and the choice made." *Motor Vehicle Mfrs.*, 463 U.S. at 43 (quotation omitted). However, it is well-settled that an agency action must be upheld if the action "is rational, based on the consideration of the relevant factors, and within the scope of the authority delegated to the agency." *Id.* at 42. In other words, "if the agency considers the factors and articulates a rational relationship between the facts found and the choice made, its decision is not arbitrary and capricious." *Delta Found. v. United States*, 303 F.3d 551, 563 (5th Cir. 2002) (quotation omitted). *See also 10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013) ("We will uphold an agency's action if its reasons and policy choices satisfy minimum standards of rationality." (quotation omitted)).

Moreover, "a reviewing court must be most deferential to the agency where, as here, its decision is based upon its evaluation of complex scientific data within its technical expertise." *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 824 (5th Cir. 2003) (cleaned up). *See also City of Shoreacres v. Waterworth*, 332 F. Supp. 2d 992, 1018–19 (S.D. Tex. 2004) ("The jurisdictional determination under the CWA is a highly technical decision within the expertise of the Corps and it is entitled to substantial deference."), *aff'd*, 420 F.3d 440 (5th Cir. 2005). Thus, district courts reviewing a jurisdictional determination will generally defer to the Corps' assessment. *See Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 906 (5th Cir. 1983) ("The wetlands determination is precisely the type of agency decision that is normally subject to limited judicial review.").

## B.    "WATERS OF THE UNITED STATES" UNDER THE CLEAN WATER ACT

### 1.    *Supreme Court Case Law*

Precisely which water features count as "waters of the United States" is not always immediately obvious. The variability of natural geography and the myriad ways water runs, washes, trickles, or seeps complicate the task of giving specificity to the term. The Supreme Court's most recent construction of the term "waters of the United States" did not adopt a bright-line rule but instead handed down a 4-1-

4 plurality opinion providing two tests for determining whether a body of water falls within the CWA's jurisdiction. *See Rapanos*, 547 U.S. 715.

The four-Justice plurality, authored by Justice Scalia and joined by Chief Justice Roberts and Justices Thomas and Alito, concluded that "the phrase 'waters of the United States' includes only those relatively permanent, standing or continuously flowing bodies of water forming geographic features that are described in ordinary parlance as streams, oceans, rivers, and lakes.'" *Id.* at 739 (cleaned up). Thus, for purposes of determining federal regulatory jurisdiction, "*only* those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands, are 'adjacent to' such waters and covered by the Act." *Id.* at 742.

Justice Kennedy concurred in the judgment but rejected the plurality's rationale. Instead, he concluded that jurisdiction extends to wetlands that "possess a 'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." *Id.* at 759. Justice Kennedy further found that wetlands "possess the requisite nexus" if "either alone or in combination with similarly situated lands in the region, [they] significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 780. Where the wetlands in question are "adjacent to navigable-in-fact waters, [the Corps] may rely on adjacency to establish its jurisdiction." *Id.* at 782. However, where the wetlands are adjacent to non-navigable tributaries, "[a]bsent more specific regulations . . . the Corps must establish a significant nexus on a case-by-case basis." *Id.*

### 2. Rapanos *Guidance*

Following *Rapanos*, the Corps and EPA issued a 13-page memorandum ("*Rapanos* Guidance" or "the Guidance") instructing the Corps and EPA personnel on how to make jurisdictional determinations that comply with the new rules for CWA jurisdiction announced by the Supreme Court. *See* Dkt. 40-2. Per the

Guidance, "regulatory jurisdiction under the CWA exists over a water body if either the plurality's or Justice Kennedy's standard is satisfied." *Id.* at 4.

The Guidance begins by instructing that the Corps and EPA will continue to assert jurisdiction over all "traditional navigable waters, which includes all the waters described in 33 C.F.R. § 328.3(a)(1), and 40 C.F.R. § 230.3(s)(1)." *Id.* at 5. Similarly, the Guidance provides that *Rapanos* left unchanged the Corps' continued assertion of jurisdiction "over wetlands adjacent to traditional navigable waters, including over adjacent wetlands that do not have a continuous surface connection to traditional navigable waters." *Id.* A finding of continuous surface connection is not required to establish adjacency.

When considering whether wetlands are "adjacent" under the significant-nexus test, the Corps is to determine whether one of the following three criteria is satisfied: (1) "there is an unbroken surface or shallow sub-surface connection to jurisdictional waters"; (2) the wetlands "are physically separated from jurisdictional waters by man-made dikes or barriers, natural river berms, beach dunes, and the like"; or (3) the wetlands "proximity to a jurisdictional water is reasonably close, supporting the science-based inference that such wetlands have an ecological interconnection with jurisdictional waters." *Id.* at 6–7.

## V.     THE PARTIES' ARGUMENTS

The parties have filed cross-motions for summary judgment. Defendants maintain that the 2019 AJD is accurate, well-reasoned, and not arbitrary and capricious. BCW contends the 2019 AJD is arbitrary and capricious, asserting four interrelated arguments, as well as a fifth all-encompassing argument based on the totality of the circumstances:

(1)   The Corps did not consider the effect of updated data placing wetlands previously excluded from jurisdiction in the 100-year "special flood hazard area" floodplain;

(2)   The Corps excluded wetlands previously identified as jurisdictional without explanation;

(3)   The Corps side-stepped addressing serious concerns raised by other government agencies during the failed 2012–2014 § 404 permitting process;

(4)   The Corps continued to rely on information supplied by Broad Reach, when its actions warranted scrutiny; and

(5)   The Corps took all the actions above, in the cumulative.

Dkt. 38 at 19.

At the outset, I note that BCW only peripherally contests the Corps' jurisdictional determination under *Rapanos*, arguing that the 2019 AJD was arbitrary and capricious because the Corps did not find that the 8.77 acres of NWI wetlands were jurisdictional. BCW contends that the Corps should have found those wetlands to be jurisdictional because they bear a "significant nexus" with Robinson Bayou based on their (1) physical proximity to the bayou and (2) "potential" to "store floodwater." Dkt. 38 at 22 (citing *Rapanos* Guidance). Alternatively, BCW claims that the Corps should have found those wetlands to be jurisdictional because they now fall in the 100-year floodplain. "[H]ad the Corps considered the [2019 FEMA map]," BCW avers, the NWI wetlands would have been considered jurisdictional because, allegedly, it was the policy of the Corps' Galveston District to typically consider wetlands within the 100-year floodplain as adjacent since they are hydrologically interrelated during flood events. *Id.* But even BCW acknowledges that the 2019 FEMA map was not *effective* until August 15, 2019—132 days after the Corps issued the 2019 AJD. In an effort to blunt the force of this unfortunate fact, BCW argues that "[t]he Corps cannot simply close its eyes to new data and rely on old data" and, at a minimum, "should have explained why reliance on the 1999 [FEMA map] was appropriate." Dkt. 43 at 21.

Aside from its grievances intertwining the NWI wetlands and the 2019 FEMA map, BCW's remaining arguments are that the Corps arbitrarily excluded wetlands previously identified as jurisdictional "without new information warranting the change" and "deferred to Broad Reach's consultants when their actions should have been scrutinized." Dkt. 38 at 19.

# VI.    ANALYSIS

**A.    THE CORPS APPLIED ITS REGULATIONS AND CONSIDERED PREVAILING LAW IN ISSUING THE 2019 AJD**

### 1.  The Corps' Wetland Determinations Satisfy Both the Rapanos Plurality and Justice Kennedy's Concurrence

To the extent BCW argues the Corps failed to faithfully apply *Rapanos* in reaching its decision, I disagree. *See* Dkt. 38 at 20–23.

The methodology for identifying wetlands is governed by the Corps' Wetlands Delineation Manual and its 2010 Regional Supplement. *See* CAR at 974–1113; CAR at 681–860. Identifying wetlands requires the assessment of three diagnostic environment characteristics: (i) soil; (ii) vegetation; and (iii) hydrology. *See* CAR at 984. Except in limited circumstances, a positive wetland determination requires evidence of a wetland indicator from all three parameters. *See* CAR at 94. *See also* CAR at 993–1015.

During its September 2018 site investigation, the Corps identified two additional wetlands that Berg Oliver had not included in its original delineation map. The first (0.18 acres of adjacent wetlands) met all three diagnostic environment characteristics. Because of mechanized land clearing, however, the Corps could not determine whether the second potential wetland (0.25 acres of isolated wetlands) satisfied the vegetation requirement. *See* CAR at 98–101. As for the previously identified tributary, the Corps reasonably concluded it "no longer exhibited an ordinary high water mark." CAR at 91. Rather, the Corps determined the "feature resemble[d] a swale," CAR at 91, which, according to the Guidance, is a geographic feature that is generally not considered jurisdictional waters.[6] *See* Dkt. 40-2 at 9. *See also Rapanos*, 547 U.S. at 761 (Kennedy, J., concurrence) ("The

---

[6] I also note that among the materials submitted by Berg Oliver is a detailed technical opinion letter prepared by a third-party environmental consultant firm that explains why the previously identified tributary no longer meets the definition of waters of the United States. *See* CAR at 142–52.

Corps views tributaries as within its jurisdiction if they carry a perceptible 'ordinary high water mark.'" (quoting 33 C.F.R. § 328.4(c))).

When Berg Oliver submitted its supplemental delineation map in October 2018, it identified both wetlands mentioned above. *See* CAR at 124. Because it was not immediately apparent whether the 0.25 acres of wetlands—which the Corps and EPA eventually determined were isolated—were adjacent wetlands (i.e., de facto jurisdictional) or isolated wetlands (i.e., case-specific jurisdictional), the Corps, consistent with the Guidance, considered whether the wetlands had a continuous surface connection to the Robinson Bayou (*Rapanos* plurality) or shared a "significant nexus" with the Robinson Bayou (Kennedy concurrence). The 0.25 acres of wetlands clearly do not satisfy the plurality test, as they do not have a continuous surface connection to Robinson Bayou. *See Rapanos*, 547 U.S. at 742 (plurality) ("*only* those wetlands with a continuous surface connection to bodies that are 'waters of the United States,' in their own right, so that there is no clear demarcation between 'waters' and wetlands, are 'adjacent to' such waters and covered by the Act.").

As for the significant-nexus test, because the 0.25 acres of wetlands' principal source of hydrology is precipitation, the Corps reasonably determined that these wetlands had no hydrological connection to Robinson Bayou, nor were they considered "reasonably close" such that there was a "reasonable inference of ecologic interconnection." *Id*. at 780 (Kennedy, J., concurrence). *See also City of Shoreacres v. Waterworth*, 420 F.3d 440, 446 n.3 (5th Cir. 2005) ("The Corps generally has broad discretion to decide whether a sufficient hydrological nexus exists to bring wetlands under regulatory control."). The 0.25 acres of wetlands also met the regulations' definition of "isolated waters" because the wetlands consist of non-tidal water that is not: (1) part of a surface tributary system to waters of the United States; or (2) adjacent to such tributary waterbodies. *See* 33 C.F.R. § 330.2(e). Admittedly, the 0.25 acres of isolated wetlands now lie in the 100-year

floodplain, but that was not the case when the Corps issued the 2019 AJD. *See* Section III(C). *See also* Section VI(B).

It is not my role to second-guess the Corps' procedures or conduct additional fact-finding. Rather, I must only decide whether there is a rational connection between the evidence in the record and the agency's decision. *See Sierra Club v. EPA*, 939 F.3d 649, 664 (5th Cir. 2019). *See also Bowman Transp., Inc. v. Ark.- Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) ("A reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." (cleaned up)). For the reasons mentioned above and in the following sections, I find that there is a rational connection between the evidence in the record and the Corps' decision.

### 2. *The Corps Conducted Its Own Independent Investigation*

Contrary to BCW's assertion, the Corps did not blindly defer to Berg Oliver's data or delineation assessment.

The record reveals that the Corps reviewed: (1) aerial photographs; (2) the NWI; (3) soil surveys; (4) the 1999 FEMA map; (5) USGS topographic maps from 1955 and 2010; and (6) information submitted by Berg Oliver. *See* CAR at 117. After performing a desk review of this data, the Corps conducted an on-the-ground investigation of the Property in September 2018, during which it identified additional wetlands and required that Berg Oliver perform additional delineation work and submit a revised delineation map. *See* CAR at 120. *See also* CAR at 117.

BCW places undue weight on the fact that representatives from Broad Reach and Berg Oliver attended the September 2018 site visit. But this is far from uncommon, and BCW does not explain why the attendance of either the property owner or a retained environmental consultant would undermine the independence of the Corps' visit. Nor does BCW explain why the Corps' review of data submitted

by Berg Oliver was inappropriate or undermines its eventual determination. Regardless, the Fifth Circuit has consistently shot down the argument that courts should not defer to an agency decision where the agency relied on either its own or another party's consultant. *See Avoyelles*, 715 F.2d at 906 n.17 ("As long as the agency conducts its own independent and thorough review of the consultants' report, the agency's reliance on outside reports is within its discretion and does not change the standard of review."); *Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 641 (5th Cir. 1983) ("As long as there is proof of actual agency review, it is not a delegation of authority to an interested party to make an environmental assessment for the Corps.").

Here, the Corps developed a comprehensive administrative record supporting its decision. While the Corps did consider reports prepared by Berg Oliver, it also carefully scrutinized and rejected some of those findings based on its independent review of the data. On this record, and considering the deference owed to an agency decision based upon the agency's evaluation of complex scientific data within its expertise, it was neither arbitrary nor capricious for the Corps to consider the information supplied by Broad Reach. *See Avoyelles*, 715 F.2d at 906 ("The [jurisdictional] determination itself, which requires an analysis of the types of vegetation, soil and water conditions that would indicate the existence of wetlands, is the kind of scientific decision normally accorded significant deference by the courts.").

### 3. The Corps Considered the NWI Data

The record plainly demonstrates that the Corps *did* consider wetlands identified by the NWI, some of which it ultimately determined were adjacent wetlands subject to the CWA's regulatory jurisdiction. *See* CAR at 25. BCW essentially complains that the Corps' failure to designate all NWI wetlands as jurisdictional under the CWA was arbitrary and capricious.[7] I disagree.

---

[7] As for BCW's argument that the NWI wetlands should have been considered jurisdictional under *Rapanos* Guidance because of their physical proximity to Robinson Bayou and potential to store

The NWI is maintained by the USFWS with the objective of mapping wetlands and deepwater habitats. *See* CAR at 1114. NWI maps are prepared using high-altitude imagery. *See* CAR at 1114. The USFWS expressly recognizes that a "margin of error is inherent" with high-altitude imagery and acknowledges that a "detailed on-the-ground inspection of any particular site may result in revision of the wetland boundaries or classification established through image analysis." CAR at 1114.

More importantly, the USFWS advises that "regulatory agencies with jurisdiction over wetlands," such as the Corps, "may define and describe wetlands in a different manner than that used" by the USFWS. CAR at 1114. For this very reason, the Corps' Wetlands Delineation Manual cautions that "not all delineated areas on NWI maps are wetlands under Department of Army jurisdiction," and "NWI maps should not be used as the sole basis for determining whether wetland vegetation is present." CAR at 1018 (emphasis omitted). Per the Wetlands Delineation Manual, "[t]he optimum use of NWI maps is to plan field review . . . and to assist during field review, particularly by showing the approximate areal extent of the wetland." CAR at 1018. That is precisely how the Corps used the NWI maps in this case.

The record reflects that the Corps duly considered the NWI maps, consistent with its guidance. For the reasons explained above, NWI maps are not dispositive nor a substitute for an actual on-the-ground investigation. Here, after its site inspection, it was reasonable for the Corps to conclude that the results of its independent investigation took precedence over wetland estimates found in the

---

floodwater, *see* Dkt. 38 at 22, I note that BCW relies on a portion of the Guidance that addresses "(1) non-navigable tributaries that are not relatively permanent, (2) wetlands adjacent to non-navigable tributaries that are not relatively permanent, and (3) wetlands adjacent to, but not directly abutting, a relatively permanent tributary." Dkt. 40-2 at 9 (footnote omitted). Regardless, for the reasons explained in Section VI(A)(1), wetland identification requires the assessment of soil, vegetation, and hydrology. Questions of physical proximity or ecological interconnectivity are immaterial if the NWI wetlands do not fall within the CWA's regulatory jurisdiction. In this sense, BCW's argument puts the cart before the horse.

NWI. At most, BCW's complaint regarding the NWI maps represents a mere disagreement with the Corps' analysis, which is an insufficient basis for me to reverse an agency decision.

For these reasons, the Corps' decision that some of the NWI wetlands on the Property are not jurisdictional under the CWA was not arbitrary and capricious. *See Delta Found.*, 303 F.3d at 563 (holding that an agency action is not arbitrary and capricious "if the agency considers the factors and articulates a rational relationship between the facts found and the choice made" (quotation omitted)).

### *4. The Corps Did Address Changes Between the 2006 AJD and the 2019 AJD*

BCW complains that the Corps' "unexplained" reduction in jurisdictional waters in the 2019 AJD compared to the 2006 AJD renders its decision arbitrary and capricious. However, the Corps provided a reasoned explanation for the decrease in jurisdictional waters. Namely, the tributary previously found to be waters of the United States in 2006 no longer functioned as a tributary with a bed, bank, and ordinary high-water mark. *See* CAR at 26, 91. Instead, as explained, the Corps determined it "resemble[d] a swale," CAR at 91, a geographic feature generally not considered to be jurisdictional waters. *See* Dkt. 40-2 at 9.

BCW also weaves together a sinuous argument that the 2006 AJD and Broad Reach's prior attempts to obtain a § 404 permit demonstrate that the Corps overlooked jurisdictional wetlands when it issued the 2019 AJD. Cutting through the noise, BCW complains that the 2006 AJD and Broad Reach's two § 404 permit applications (in 2012 and 2013) identified more jurisdictional waters than the Corps ultimately found existed in the 2019 AJD.

Put bluntly, the Corps reasonably analyzed the request before it—Broad Reach's 2018 request for an AJD. AJDs are valid for five years, a limitation that recognizes the nature of land changes over time. As for § 404 permit applications, those are requests to conduct certain activities that affect jurisdictional waters. *See*

33 C.F.R. § 325.1. Nothing in a permit application can legally confer CWA jurisdiction, nor should it be considered as evidence of jurisdictional waters.

Before issuing the 2019 AJD, the Corps was simply required to apply its regulations and the Guidance, which it did. *See* Section VI(A)(1). I agree that, had there been a *significant* change in jurisdictional waters compared to the 2006 AJD, such an *unexplained* reduction could render the 2019 AJD arbitrary and capricious. But the record demonstrates that the Corps has provided a reasoned explanation for its determination that the Property contained 0.22 fewer acres of jurisdictional waters in 2019 than it did in 2006.

## B.   IT WAS REASONABLE FOR THE CORPS TO CONSIDER THE FEMA MAP THAT WAS IN EFFECT AT THE TIME OF ITS DECISION

I saved this argument for last because I have significant reservations about whether the 2019 FEMA map is even properly before me, given that it was not part of the record before the Corps when it issued the 2019 AJD.

Before briefing their respective summary judgment motions, the parties stipulated that Defendants would not oppose BCW's citation to two pieces of evidence "during merits briefing . . . on the grounds that such documents are extra-record materials": (1) the 2019 FEMA map; and (2) a February 2001 memorandum issued by the Corps, titled "Adjacent/Isolated Criteria, Galveston District Policy Number 01-001"[8] (the "2001 Policy"). *See* Dkt. 36-1 at 2–3. The parties further stipulated that they would "defer to merits briefing the question of whether [either exhibit] represents adverse evidence." *Id.* at 3.

BCW appears to have been under the impression that the parties' stipulation was sufficient to supplement the administrative record, because it raises no argument in its opening brief as to why I should consider this extra-record

---

[8] BCW's argument regarding the relevance of these two pieces of evidence is relatively straightforward. The 2019 FEMA map placed a sizable portion of the Property inside the 100-year floodplain. And the 2001 Policy provides, in relevant part, that "[i]t is reasonable to consider wetlands/waters that lie within the 100-year floodplain as adjacent." Dkt. 38-2 at 3. The 2001 Policy goes on to explain that "[t]he practice within the Galveston District has been to use the 100-year flood maps published by FEMA as a tool" for determining hydrological connections. *Id.*

evidence. However, on judicial review, parties cannot simply add evidence to the administrative record by stipulation when that evidence was not before the reviewing agency when it rendered the decision at issue.

Indeed, where a party seeks review of an agency decision, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Absent "unusual circumstances," supplementation of the record is not allowed. *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010). The Fifth Circuit has held that supplementation may be permitted only when: (1) "the agency deliberately or negligently excluded documents that may have been adverse to its decision"; (2) the district court needs "to supplement the record with 'background information' in order to determine whether the agency considered all of the relevant factors"; or (3) "the agency failed to explain administrative action so as to frustrate judicial review." *Id*. It is the moving party's burden to prove that one of these three narrow exceptions applies. *See id.*

As mentioned, BCW seemingly assumes the extra-record evidence was properly before the Court based on the parties' stipulation, as it did not raise any of the three above-mentioned arguments until responding to Defendants' summary judgment motion. *See* Dkt. 43 at 26–27. Nevertheless, I find that the 2019 FEMA map and 2001 Policy come in under the second exception. Although I appreciate Defendants' argument that I cannot consider this extra-record evidence "to draw an adverse inference regarding the Corps' analysis," Dkt. 40 at 32, I find that supplementation is necessary to determine whether the Corps considered all the relevant factors in reaching its decision.[9]

---

[9] I note that the Corps was made aware of the 2019 FEMA map before issuing the 2019 AJD. *See* CAR at 29. While my decision is not based on this alone, the fact that the 2019 FEMA map was brought to the Corps' attention mere days before it was finalized for the express purpose of alerting the Corps to FEMA's revisions that placed a greater portion of the Property within the 100-year floodplain militates toward considering it as background information relevant to determining whether the Corps considered all the relevant factors. As for the 2001 Policy, whether

Ultimately, the question of whether and to what extent I can consider the 2019 FEMA map or the 2001 Policy proves inconsequential to my decision.

"[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001); *accord Statoil USA E&P Inc. v. U.S. Dep't of the Interior*, 352 F. Supp. 3d 748, 757 (S.D. Tex. 2018) (same); *Redeemed Christian Church of God v. U.S. Citizenship & Immigr. Servs.*, 331 F. Supp. 3d 684, 694 (S.D. Tex. 2018) (same). *See also Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007) ("Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." (quotation omitted)).

It is well-settled that the law in effect at the time of the decision on appeal is the law that is to be applied unless manifest injustice will result or statutory direction or legislative history is to the contrary. *See Bradley v. Richmond Sch. Bd.*, 416 U.S. 696, 711 (1974). Though not a perfect corollary, the 2019 FEMA map was not in effect when the Corps issued the 2019 AJD; in fact, it would not become effective for 132 more days.

Neither party has directed me to a case on this issue. Instead, they both make common-sense arguments. According to Defendants, the Corps applied the regulation that was in place at the time it issued the 2019 AJD. BCW, on the other hand, argues it was arbitrary and capricious to apply the soon-to-be-outdated 1999 FEMA map when the 2019 FEMA map was finalized before issuance of the 2019 AJD, publicly available, and places a significant portion of the Property in the 100-year floodplain.

---

Corps engineers in the Galveston District applied a Galveston District policy is certainly background information that will help me determine whether the Corps considered all the relevant factors in reaching its decision.

The Corps' consideration of the 1999 FEMA map does not render the 2019 AJD arbitrary or capricious, nor was it an abuse of discretion or otherwise violative of the CWA. Although I have considered the 2019 FEMA map as extra-judicial evidence under one of the narrow exceptions to the record rule, the rationale underpinning judicial review of an agency's decision remains unchanged. I must "uphold [the Corps'] decision if its reasons and policy choices satisfy minimum standards of rationality." *10 Ring Precision*, 722 F.3d at 723 (quotation omitted). It cannot be said that the Corps' decision to apply the FEMA floodplain map that was in effect at the time it issued the 2019 AJD fails to satisfy the minimum standards of rationality. While the more prudent approach may well have been to consider the 2019 FEMA map, I cannot substitute my judgment for that of the Corps. *See Motor Vehicle Mfrs.*, 463 U.S. at 43. In any event, whether the Corps chose the most prudent approach is beside the point. *See Wilson v. U.S. Dep't of Agric.*, 991 F.2d 1211, 1215 (5th Cir. 1993) ("The agency decision need only have a rational basis, and it does not have to be a decision which the court would have made.")

I understand BCW's argument that the 2019 FEMA map is a relevant factor that the Corps failed to consider. But to find an agency's decision arbitrary and capricious where the agency considered a regulation or ordinance that was in effect at the time of its decision stands at odds with the norms of administrative law and typical judicial review of agency action. On this record, I cannot say that the Corps' decision to consider the then-in-effect 1999 FEMA map was "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Wilson*, 991 F.2d at 1215 (quotation omitted). The Corps has articulated a satisfactory explanation for considering the 1999 FEMA map—namely, it was in effect—and articulated a rational connection between the facts found and the choice made. *See Motor Vehicle Mfrs.*, 463 U.S. at 43.

## CONCLUSION

BCW's challenge to the 2019 AJD fixates on the weight the Corps accorded to the evidence before it and BCW's desire that I weigh the record evidence differently. But my role in reviewing the Corps' decision is simply to consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. In that capacity, I find that the Corps applied its regulations, reviewed the relevant data, conducted its own independent investigation, and reasonably concluded that the Property contained 3.03 acres of waters governed by the CWA's regulatory jurisdiction. None of BCW's arguments, whether alone or in combination, demonstrates that the Corps' jurisdictional determination was arbitrary and capricious, an abuse of discretion, or otherwise violates the CWA, nor has BCW shown that the Corps' decision was a clear error of judgment.

Accordingly, for the reasons explained above, I recommend the Court **DENY** BCW's motion for summary judgment (Dkt. 38) and **GRANT** the Defendants' motion for summary judgment (Dkt. 40).

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have 14 days from receipt to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

Signed on this 6th day of September 2022.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE